USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 24, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

RANDOLPH EQUITIES, LLC, FAROUK ADAM
SHARIF, and TIERNEY SHARIF,                            :

                              Plaintiffs,                   :          05 Civ. 10889 (PAC)

         -against-                              :          OPINION & ORDER

CARBON CAPITAL, INC., and                             :
BLACKROCK, INC.,
                                                          :
                         Defendants.

---------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

This is a real estate dispute arising out of Defendants' termination of a planned $16.7 million mezzanine financing loan for Plaintiffs' real estate transaction. Plaintiffs' Second Amended Complaint ("SAC") alleges five claims: breach of contract; fraud; tortious interference with prospective business advantage; promissory estoppel; and equitable estoppel. Defendants now move for summary judgment and Plaintiffs cross-move for partial summary judgment for their breach of contract claim and certain damages claims. For the reasons discussed below, the Defendants' motion for summary judgment is GRANTED in part and DENIED in part, and the Plaintiffs' motion for partial summary judgment is DENIED.

## BACKGROUND

### I.   Factual History[1]

#### a.   The Treasures Holdco Dispute

Plaintiff Randolph Equities, LLC ("Randolph") is a Chicago-based real estate development and investment firm whose principal is Plaintiff Farouk Adam Sharif. Plaintiff

---

[1] The facts within the section are taken from the Second Amended Complaint, the parties' Rule 56.1(a) statements, and the supporting affidavits and exhibits, unless otherwise noted.

Tierney Sharif is Sharif's wife. (See Defendants' Rule 56.1 Statement ("Def. 56.1") ¶¶ 1-3.) Defendant Carbon Capital, Inc. ("Carbon") is a New York-based private real estate investment fund. (Id. ¶ 4.)  Defendant BlackRock, Inc. ("BlackRock") is a publicly traded investment management company with a subsidiary, BlackRock Financial Management, Inc., which is Carbon's investment manager. (Id. ¶ 5.)

Randolph held a beneficial ownership interest in a limited partnership called Treasures Holdco, which had been organized for the purpose of acquiring and developing a residential apartment complex called Treasures-on-the-Bay ("the property") in Miami-Dade County, Florida. (Id. ¶¶ 6-12.)  In March 1999 Treasures Holdco purchased the property. (See Plaintiffs' Rule 56.1(a) Statement ("Pl. 56.1") ¶ 1.)  Following the purchase, a dispute arose between Randolph and its partners, and in 2001, Randolph sued the partners in an Illinois state court for dissolution of the partnership and disposition of the property.  Over the next two years the Illinois court dissolved the partnership and established a bidding process for the sale of the property, subject to judicial monitoring. (Id. ¶ 2; Def. 56.1 ¶ 19.)

**b.  Randolph Bids for the Property and Arranges Financing**

Randolph bid on the property, and on July 1, 2003, the Illinois court ordered Randolph to provide "unequivocal commitments to close at a purchase price of $51,250,000, with committed financing sufficient to fund the pro forma distribution presented to the court." (See Randolph's Joint Appendix of Exhibits ("Pl.") Ex. 14.)  The court's order also stated that a competing entity called GREC Conversion IV LLC ("GREC") could submit a purchase proposal. (Id.)

Following the court's order Randolph sought financing for its proposed purchase and conversion of Treasures-on-the-Bay to condominiums.  On July 11, 2003, Ohio Savings Bank ("OSB") Vice President David Smith wrote in a letter to Randolph that the bank was interested

in providing a loan of more than $50 million, and he noted that the bank required Randolph to obtain an additional institutional mezzanine loan of not less than $10 million. (Id. Ex. 17 at 1.) On August 4, 2003, Randolph signed a letter of intent with Carbon for $10.82 million in mezzanine financing.[2] (Id. Ex. 31 at 1.)

On August 18, 2003, Randolph asked the Illinois court to approve its $51.75 million bid for the property. The bid included an earnest money deposit of $500,000 in cash and $1.5 million in the form of a pledge of Randolph's interests in the proceeds of the sale of Treasures-on-the-Bay. (Id. Ex. 40 at 2.) Attorneys for Randolph and for defendants in the Illinois case (the defendants are collectively referred to as the "Husman Group") appeared before Judge Stephen A. Schiller. Over the objections of the Husman Group, Judge Schiller conditionally approved Randolph's offer to purchase the property. (Id. Exs. 38-39.) Judge Schiller's order of August 18, 2003 stated that "[a]ll conditions set forth in the draft loan commitment letters submitted by Randolph shall be waived in writing by such lenders by August 27, 2003, except; legal opinions; title and survey. Randolph shall accept all existing conditions subject to approval of the title documents." (Id. Ex. 39.) Further, he ordered Randolph to forfeit the $500,000 cash deposit if it could not provide the waivers of condition by August 27, 2003, and the Husman Group would be free to enter into a contract with GREC at that point. (Id.) The transcript of the August 18 hearing makes clear Judge Schiller's interest in eliminating contingencies and completing the sale of the property. Judge Schiller stated, "I would be willing to approve Randolph Equities' offer with the following conditions: One, that the $500,000 be posted. Second, that all

---

[2]    "In the real estate industry a mezzanine financing refers to a loan secured principally by the borrower's equity in other entities. Unlike conventional mortgage financing where the borrower owns real estate, a mezzanine borrower doesn't directly own any real property nor does it operate any business—it acts merely as a sort of holding company." Andrew R. Berman, "Once a Mortgage, Always a Mortgage" - The Use (and Misuse) of Mezzanine Loans and Preferred Equity Investments, 11 Stan. J.L. Bus. & Fin. 76, 79 (2005). The Defendants describe mezzanine loans as "similar to second mortgages, except that a mezzanine loan is secured by the stock of the borrower, in this case Randolph Equities." (See Affidavit of Chris Milner ("Milner Aff.") ¶ 10.)

conditions be waived by the 27th . . . with the exception of legal opinion." (See Pl. Ex. 38 at 08:11-16 (emphasis added).)

Between August 18 and August 27, 2003, Randolph, OSB, and Carbon discussed how to comply with the court's August 18 order. OSB suggested issuing what it called an "estoppel letter," which it described as a document that "typically eliminates many standard loan contingencies by confirming that they have been satisfied, which makes the takeout loan a more definite obligation of the takeout lender." (Id. Ex. 43 at 1.) On August 21, 2003, James Parmeter, of Defendant BlackRock, noted in an e-mail that "[t]he judge['s] order states that lenders must waive all contingencies to the closing and funding except for title, survey and legal opinions." (Id. Ex. 47.) On August 27, 2003, Carbon Director Alexander Zabik sent a letter to Sharif which stated that Carbon was approving the mezzanine funding "subject to the remaining terms and conditions of the Commitment Letter. Once you have received proper court approval, we will commence our remaining due diligence and loan documentation." (Id. Ex. 66.)

On August 27, 2003 the Illinois court denied Randolph's motion and application to purchase the property, and instead granted the competing buyer's application. (Id. Ex. 67.) On September 5, 2003, however, the competing buyer failed to satisfy the court's order, and the Illinois court gave Randolph five days to present evidence by September 10, 2003, that its lenders had resolved their preconditions to the purchase of the property. (Id. Exs. 78-79.)

### c.  Carbon and Ohio Savings Bank Revise Letters

Recognizing that the Illinois state court judge would reject non-conforming offers, Randolph, OSB, and Carbon discussed how to revise the commitment letters. On September 10, 2003, OSB faxed a letter to Sharif stating that:

> Ohio Savings Bank is prepared to close on the acquisition portion of its
> loan transaction with Randolph Acquisition IV, L.L.C. by funding

> $34,000,000 for acquisition costs, subject to the Bank's review and
> approval of the property's title and survey, its receipt of acceptable legal
> opinions, the negotiation of loan documents, and the review of Randolph's
> loan documentation with its mezzanine lender.  The Bank anticipates
> closing with 30 days.

(Id. Ex. 84.)

Carbon's Zabik immediately sent an e-mail attaching the letter from OSB (the "9/10 OSB

Letter"), and stating in a one-line note, "they waived everything." (Id. Ex. 85.)  That same day

Zabik also faxed a one-page letter to Sharif which mirrored the language in the 9/10 OSB Letter:

> Carbon Capital, Inc. ("Carbon") is prepared to close on the mezzanine
> portion of its loan transaction with Randolph Equities, L.L.C. by funding
> up to $16,700,000 subject to Carbon's review and approval of the
> property's title and survey, its receipt of acceptable legal opinions, the
> negotiation of loan documents, the review and approval of Randolph's
> loan documentation with its first mortgage lender, traditional mezzanine
> lender approval rights and material adverse changes in the economy or the
> capital markets.  Carbon anticipates closing within 30 days.

(Id. Ex. 87.)  In addition to this "9/10 Carbon Letter," Carbon provided a revised commitment

letter and letter of intent. (See Milner Aff. Exs. C, D.)  Under an "Exclusivity" heading on page

four, paragraph five, the September 10, 2003 Letter of Intent states that it "will terminate on the

30th day following the execution of this Letter of Intent by the Principal but may be terminated

sooner by Lender if Lender advises Principal that it does not intend to proceed with the Loan."

(Id. Ex. D at 4 (emphasis added).)  The Commitment Letter contains a no-oral-modification

clause, stating that "[n]o amendment or modification to this Commitment Letter will be effective

unless evidenced by a writing executed by all the parties hereto." (Id. Ex. C at 3.)

Randolph presented the OSB and Carbon letters to the Illinois court, which scheduled a

hearing for September 12, 2003, to resolve questions about which contingencies remained.[3]

---

[3]     The parties dispute exactly which documents were presented to Judge Schiller at a status conference on
September 10, 2003.  The transcript of the September 12, 2003 hearing makes clear that he had seen the OSB and
Carbon 9/10 letters (see Pl. Ex. 100 at 04:07-14, 16:23-17:22), but the parties disagree about whether the judge had

Carbon, OSB, and Randolph purportedly had several calls over the next two days to discuss the upcoming hearing.  Randolph claims that Carbon stated that it would send Jon Glickman, an employee at AFC Realty Capital, Inc. ("AFC"), the asset manager for the project, to represent to the court that: (1) Carbon specifically limited its right to terminate the commitment to a material defect in title, survey, loan documents, and legal opinions, or a material adverse change in the economy or capital markets; (2) material adverse change meant a catastrophic event; and (3) Carbon would keep its commitment in effect through the court's October 12, 2003 closing deadline if the conditions were met. (Pl. 56.1 ¶¶ 51-54.)

### d.  The September 12, 2003 Court Appearance and Court Order

Glickman testified at the hearing on September 12, 2003. (Pl. Ex. 100.)  He identified himself as the "project manager for this project with BlackRock/Carbon Capital." (Id. 15:14-16.) Glickman testified on the record that Carbon was prepared to provide the mezzanine financing depending only upon proper survey and document and title searches, along with "loan documentation." (Id. 15:20-16:03.)  He also stated that the loan was not contingent on any environmental conditions. (Id. 16:04-15.)  On cross examination Glickman testified that no contingencies would prevent Carbon from funding the deal other than "survey, title, loan documentation and changes in the economy and capital markets." (Id. 24:15-25:03.)  Glickman was asked:

> Q: Would any negotiation or problems with the intercreditor
> agreement preclude funding?
> A: That would be loan documentation.
> Q: Has your company reviewed the appraisal?
>         . . . . .
> A: We have no issue regarding appraised value.  We understand the
> appraised value.  We've also reviewed the intercreditor agreement.

---

received or reviewed Carbon's Commitment Letter and Letter of Intent. (Compare Affidavit of William Dwyer ¶ 21 with Transcript of June 18, 2009 Oral Argument ("June 18, 2009 Tr.") 15:22-16:12.)  None of the three letters were marked as exhibits at the September 12, 2003 hearing.

> Although it's not finalized yet, we believe there's no impediments to
> closing.

(Id. 25:05-15.)

On September 12, 2003, the Illinois court issued an order approving Randolph as the purchaser of the property. The order stated that Randolph had pledged $1.5 million "of its expectancy" as a deposit, plus an additional $500,000 deposit, and that Randolph would lose these sums if the deal did not close within 30 days. (Id. Ex. 101.) Upon Randolph's application, the court later extended the closing date to October 14, 2003, as October 12 was a Sunday and October 13 a national holiday.

### e.  Carbon Terminates

Carbon terminated its funding commitment on October 9, 2003.[4] After Randolph notified the Illinois court that it had lost its financing, the court forfeited the $2 million Randolph pledged. (Id. Ex. 161.) Randolph reached a settlement with the Husman Group on November 6, 2003 that provided Randolph another chance to obtain control of the property. The agreement stated that Randolph would pay $4 million in liquidated damages if it was unable to close by January 30, 2004. (See Declaration of Seth Schwartz ("Schwartz Decl.") Ex. 18.) Randolph

---

[4]      The record is barren of contemporaneous documents explaining Carbon's reasons for termination. As part of this litigation and well after the event itself, Chris Milner, Carbon's President, describes seven reasons for Carbon's last-minute termination. (See Milner Aff. ¶¶ 9-46.) First, Carbon had questions about Randolph's choice of a contractor to conduct the condominium conversion and about the written agreement between Randolph and this contractor. Second, Carbon objected to the manner in which OSB was funding the construction, because Carbon worried that it would lead to a potential default by Randolph. This would affect Carbon negatively because its loan was subordinate to OSB's loan. Third, Carbon states that it was unable to agree with OSB on the terms on an intercreditor agreement because of a material dispute with OSB. Carbon partly blames this disagreement on Sharif, who Carbon says failed to communicate effectively between OSB and Carbon. Fourth, Sharif did not supply Carbon with a satisfactory survey of the property, as required by their agreement. Fifth, Carbon claims that it never received an opinion from Randolph confirming that its plan to convert the property to condominiums was legal. Carbon claims that this was a precondition to Carbon's loan. Sixth, Carbon claims that Randolph failed to provide a renewed submerged land lease from the State of Florida for a boardwalk adjacent to the property, another precondition to the loan. Seventh, and finally, Carbon states that in the final week it became clear to them that Sharif was unable to consummate a deal of this magnitude. Carbon states that it came to this conclusion because it issued a series of drafts of documents related to the loan and closing, and Sharif did not make a single comment on the drafts. This absence of comments convinced Carbon that Sharif was in over his head. At this stage, the Court gives no weight to Carbon's explanation for the termination.

failed to close by that date, and on July 12, 2004, Judge Schiller ruled that Randolph was liable

for the $4 million in liquidated damages. (Pl. Ex. 165.)  On August 11, 2004, Treasures Holdco

sold the property for $50 million to KMC/EC II, LLC. (<u>Id.</u> Ex. 166.)

## II.  Randolph's Claimed Damages

Randolph claims that it is entitled to a judgment for actual losses and lost profits due to

Carbon's termination.  Randolph calculates its actual damages as totaling $16,847,963 or

$11,550,061, plus lost profits. (<u>See</u> Memorandum of Law in Support of Plaintiffs' Cross Motion

("Pl. Mem.") 12-13.)  This higher damage amount includes $10,244,967 in lost partnership

equity distribution from Treasures Holdco; $1,057,594 in pre-development costs that were to be

reimbursed by Carbon; and Randolph's lost ability to pursue a $5,545,402 claim against the

Husman Group over a disputed partnership interest, which Randolph could not afford to

undertake without Carbon's funding. (<u>Id.</u>)  Randolph states that its loss mitigation efforts

reduced its losses, without considering lost profits, to $13,538,445 or $8,240,543, or even as low

as $12,543,130 or $7,245,228 if pre-development costs are not included and lost profits are

awarded. (<u>See</u> Pl. 56.1 ¶¶ 88-95.)

## III. Procedural History

Plaintiffs filed their original complaint on December 30, 2005, and amended the

complaint on March 8, 2006.  The first two complaints included claims against AFC.

Defendants moved to dismiss the claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  On March 26, 2007, the Court found that AFC should be dismissed from the

complaint because: (1) AFC was not a party to the second contract between Randolph and

Carbon; (2) Plaintiffs could not show that AFC interfered with any business relationships; (3)

AFC made no promise which could create an estoppel claim; and (4) the allegations that AFC

caused damages to Plaintiffs were too attenuated. See Randolph Equities, LLC v. Carbon Capital, Inc., 05 Civ. 10889 (PAC), 2007 WL 914234, at *4, *6, *8 (S.D.N.Y. Mar. 26, 2007). The Court found that Plaintiffs had properly alleged claims for: (1) breach of contract against Carbon, (2) tortious interference with prospective business advantage against Carbon and BlackRock; (3) promissory and equitable estoppel against Carbon and BlackRock; and (4) fraud against Carbon. See generally id. at *3-9.

Plaintiffs filed a Second Amended Complaint on January 15, 2008, and these motions followed.  Defendants move for summary judgment on all claims.  Plaintiffs cross move for summary judgment on the breach of contract claim.  Plaintiffs also seek to recover damages incurred as of October 9, 2003 and seek a declaration that Plaintiffs may recover for lost profits by proving that amount at trial.[5]

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The evidence on each material element must be sufficient to entitle the movant to relief as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

---

[5]     Plaintiffs state in their moving papers that they do not seek summary judgment on the issue of whether they can prove lost profits at trial (see Pl. Mem. 25 n.16; Pl. Reply Mem. 10), yet they argue as part of their cross-motion for summary judgment that they should be able to prove lost profits at trial.  The Court considers this issue ripe for determination at this stage.

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," <u>Niagara Mohawk Power Corp. v. Jones Chem., Inc.</u>, 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations omitted), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

The same standard of review applies when the court is faced with cross-motions for summary judgment. <u>Morales v. Quintel Entm't, Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001). Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration. <u>Id.</u>

## II. Breach of Contract

Both parties move for summary judgment on Plaintiffs' breach of contract claim against Carbon. There are material issues of fact which preclude the granting of either motion. There are factual questions on whether Carbon waived its contractual termination rights, either through the 9/10 Carbon Letter or through Glickman's testimony at the September 12, 2003 hearing. Randolph cannot rely on any purported oral modifications to establish waiver; and Randolph must establish that it was ready, willing, and able to meet the October 14, 2003 closing date.

Carbon's argument is that while it told the Illinois court about giving up or waiving certain "contingencies," it was silent about foregoing its exclusive right of termination, and the judge failed to ask. Accordingly, Carbon relies on a clause buried under the "Exclusivity" heading of the September 10, 2003 Letter of Intent, which stated that the "Letter of Intent will

terminate on the 30th day following the execution of this Letter of Intent by the Principal but may be terminated sooner by Lender if Lender advises Principal that it does not intend to proceed with the Loan . . . ." (See Milner Aff. Ex. D at 4.)  Carbon terminated the agreement on October 9, 2003, and it argues that the Letter's plain contractual language entitles Carbon to summary judgment.  Randolph argues that Carbon waived its right to terminate the agreement through the 9/10 Carbon Letter and through Carbon's general course of conduct.  Randolph also argues that Carbon is estopped from relying on the no-oral-modification clause in the Commitment Letter because Carbon induced Randolph's reliance through oral representations that it had waived its right to terminate.  Accordingly, Randolph argues that Carbon could not terminate its obligation to provide financing until after October 14,[6] and that any prior termination was a total breach.

Under New York law, waiver of a contract right is "the voluntary abandonment or relinquishment of a known [contract] right.  It is essentially a matter of intent which must be proved." Jefpaul Garage Corp. v. Presbyterian Hosp., 462 N.E.2d 1176, 1177 (N.Y. 1984).  "Because waiver of a contract right must be proved to be intentional, the defense of waiver requires a clear manifestation of an intent by plaintiff to relinquish her known right." Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 585 (2d Cir. 2006) (internal quotation and citation omitted).[7]  Whether a party had the intent to waive is usually a matter of fact. Id.

The parties' contentions raise numerous questions: (1) Did Carbon waive its right to terminate for any reason based on (a) a written modification or (b) through its course of conduct;

---

[6]     October 14, 2003 was the extended date of closing, per court order.
[7]     See also Christian Dior-New York, Inc. v. Koret, Inc., 792 F.2d 34, 40 (2d Cir. 1986) ("To establish waiver under New York law one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it.") (quotation and citation omitted).

(2) does Carbon's no-oral-modification clause apply to any purported oral modifications; and (3) does Plaintiffs' breach of contract claim fail as a matter of law because they cannot show that they would have been ready and willing to close on October 14, 2003.

### a.  Was the 9/10 Carbon Letter a Waiver?

Plaintiffs argue that the 9/10 Carbon Letter "clearly eliminated all grounds to terminate the 9/10 Commitment, except for those specific exceptions enumerated in that . . . Letter." (Pl. Mem. 15.)  Carbon's intent to waive all other basis for termination is clear when comparing the 9/10 Carbon Letter with Carbon's letter of August 27, 2003.  The earlier letter, from Carbon to Sharif, states that Carbon "is pleased to inform you that it has obtained internal credit committee approval for the mezzanine mortgage loan," but that "our obligation to fund is still subject to the remaining terms and conditions of the Commitment Letter." (Pl. Ex. 66 (emphasis added).)[8] Plaintiffs argue that the 9/10 Carbon Letter does not make the same reservation, which shows Carbon's intent to waive all conditions, except those enumerated in the letter itself.  Plaintiffs also argue that Zabik's e-mail of September 10, 2003, stating that OSB had "waived everything," shows that Carbon intended to "waive everything" by submitting a substantially similar letter.

Carbon characterizes the 9/10 Carbon Letter as an informal cover letter only.  Carbon's argument is that its right to terminate was not subject to any preconditions, so that even if some conditions were waived or modified by the 9/10 Carbon Letter, Carbon's ability to terminate at any time was unaffected.  Carbon also argues that if the 9/10 Carbon Letter eliminated all terms of the commitment other than what was listed in the letter, then many other material terms would suddenly disappear from the agreement.

---

[8]      Both the August 27, 2003 and September 10, 2003 commitment letters incorporate the at-will termination provisions of the letters of intent on those dates.

At issue is the meaning of the 9/10 Carbon Letter and whether Carbon intended it to waive its right to terminate at will.  Whether a party has the intent to waive a contractual right is generally a matter of fact, not a matter of law.  This suggests that the Court should not grant summary judgment on this issue. See, e.g., Christian Dior-New York, Inc. v. Koret, Inc., 792 F.2d 34, 39-40 (2d Cir. 1986) (finding that a defendant claiming that plaintiff waived its right to terminate a licensing contract "must also be given an opportunity to prove its waiver defense at trial"); Champion Spark Plug Co. v. Auto. Sundries Co., 273 F. 74, 79-80 (2d Cir. 1921) (finding that waiver issue depended on the intention of the parties, and that "where such intent is disputed, it necessarily becomes a question for the determination of a jury").

Examining the 9/10 Carbon Letter in conjunction with the Commitment Letter and Letter of Intent, there is no clear way to determine, without treading onto the territory of the fact finder, whether Carbon intended to waive the at-will termination provision. See Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc., 269 F. Supp. 2d 356, 360 (S.D.N.Y. 2003) ("[W]here two or more written instruments between the same parties concerning the same subject matter are contemporaneously executed, they will be read and interpreted together.") (quotation and citation omitted).  This factual determination is not the Court's role at this stage of the litigation. See Anderson, 477 U.S. at 248-49.  It suffices to say that the Court cannot find that the 9/10 Carbon Letter is a waiver as a matter of law, nor is it obvious that Carbon did not intend to waive its right to terminate at-will.  Carbon's intent is a material matter in dispute, and the fact finder must resolve that question.

**b.  Did Carbon Waive by its Course of Conduct?**

Plaintiffs argue that even if the 9/10 Carbon Letter was not a waiver of the at-will termination provision, Carbon agreed to waive that right through its course of conduct.  A party

may waive its contractual rights through its subsequent course of conduct, see Seven-Up Bottling Co. v. Pepsico, Inc., 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988), but "a waiver of contractual rights will not be inferred absent a clear intent to waive." Aniero Concrete Co. v. New York City Constr. Auth., Nos. 94 Civ. 9111 (CSH), 95 Civ. 3506 (CSH), 1998 WL 148324, *10 (S.D.N.Y. Mar. 30, 1998).  Plaintiffs' course-of-conduct argument involves both oral assurances (i.e. that Carbon would waive all contingencies, send Glickman to the hearing to explain Carbon's waiver, and keep the financing commitment open until October 14, 2003) and written assurances (i.e. Glickman's testimony at the September 12, 2003 hearing).[9]

Carbon argues that any supposed oral waivers fail as a matter of law because of the no-oral-modification clause within the Commitment Letter. (See Milner Aff. Ex. C at 3.)  New York General Obligations Law § 15-301 provides that "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."  A party can overcome a no-oral-modification clause by showing either partial performance or equitable estoppel. See United States v. Schwimmer, 968 F.2d 1570, 1575 (2d Cir. 1992).  To rely on the partial performance exception, "that partial performance must be 'unequivocally referable' to the new contract." Merrill Lynch Interfunding v. Argenti, 155 F.3d 113, 122 (2d Cir. 1998) (quoting Rose v. Spa Realty Associates, 366 N.E.2d 1279, 1283 (N.Y. 1977)).  In other words, "the actions alone must be unintelligible or at least extraordinary, explainable only with reference to the oral agreement." Anostario v. Vicinanzo, 450 N.E.2d 215, 216 (N.Y. 1983) (internal quotation and citation omitted).  Equitable estoppel applies "if one party to the written contract

---

[9]     Carbon acknowledges that Glickman's testimony is a writing for statute of frauds purposes. (See June 18, 2009 Tr. 04:25-05:02.)

'has induced another's significant and substantial reliance upon an oral modification,' and if the conduct relied upon is 'not otherwise . . . compatible with the agreement as written.'" <u>EMI Music Mktg. v. Avatar Records, Inc.</u>, 317 F. Supp. 2d 412, 421 (S.D.N.Y. 2004) (quoting <u>Rose</u>, 366 N.E.2d at 1283).

Carbon argues that even if Carbon officials did make oral promises of a waiver—which Carbon denies[10]—Plaintiffs cannot show any subsequent performance in reliance on or "unequivocally referable" to any purported oral modification.  Randolph states that it pledged the $1.5 million expectancy plus $500,000 cash deposit at the close of the September 12, 2003 hearing in reliance on Carbon's oral modifications to the agreement.  Randolph argues that even though it had previously pledged the same amount in the August 18, 2003 contract that Judge Schiller refused to approve, Randolph would have "pulled out . . . and not committed to give up the $2 million" (<u>see</u> June 18, 2009 Tr. 20:25-21:01), or not have re-pledged the same amount, had it not been relying on Carbon's oral commitments.  Randolph's arguments are not persuasive.  Randolph's actions following the alleged modifications were no different than its actions before the alleged oral modifications—it continued to seek court approval of the purchase and it continued to pledge $2 million toward that purchase.  Randolph had agreed to pledge $1.5 million of its expected profit and pay $500,000 as part of the August 18, 2003 contract, and there is no evidence that Randolph made any new promises or pledges in reliance on conversations with Carbon between September 10 and September 12, 2003.  The no-oral-

---

[10]     Much of Plaintiffs' evidence supporting a waiver through course of conduct relies on statements reportedly made during unrecorded conference calls between Randolph, OSB, and Carbon. (<u>See</u> Pl. 56.1 ¶¶ 52, 54, 67, 68.) Carbon executives state that they cannot remember what was said during these calls, or, in some cases, even if the calls occurred. (<u>See</u> Deposition of Alexander Zabik ("Zabik Dep."), located at Randolph's Deposition Testimony Volume ("Pl. Dep. Vol.") Ex. C at 194:15-197:22; Deposition of Daniel Sefcik ("Sefcik Dep."), Pl. Dep. Vol. Ex. D at 220:11-19; Deposition of Candace Wilhelm ("Wilhelm Dep."), Pl. Dep. Vol. Ex. I at 168:15-170:13.)

modification clause governs, and Randolph cannot rely on oral statements to show that Carbon waived its termination rights through its course of conduct.[11]

What is left for Randolph's course-of-conduct argument is Glickman's transcribed testimony at the September 12, 2003 hearing.  There is an issue of material fact about whether Glickman waived Carbon's right to terminate for any reason.  The Court puts considerable weight on what Judge Schiller intended to resolve at that hearing.  It is clear from the transcript that Judge Schiller was most concerned with selecting the buyer with the fewest impediments to closing.  (See generally Pl. Ex. 100.)  Randolph and Carbon disagree about the meaning of Glickman's testimony, but the Court has little doubt that the parties understood Judge Schiller's motivation for holding the hearing and for questioning Glickman on the record.  The court repeatedly asked Glickman about Carbon's remaining contingencies, and at no time did Glickman explain Carbon's right to terminate for any reason prior to closing.  Carbon should have understood that Judge Schiller's purpose was to determine whether there were any material terms that could prevent Carbon from financing Randolph's purchase.

Nonetheless, the Court cannot determine on a motion for summary judgment whether such an omission qualifies as a waiver as a matter of law.  For the reasons already described, the key question in determining waiver of a contact right is the intent of the party charged with the waiver. See Christian Dior, 792 F.2d at 40.  The Court cannot rule at this stage whether Carbon waived its right to terminate for any reason due to its course of conduct.  The Plaintiffs will have an opportunity at trial to prove that Carbon intended to waive that right.

---

[11]     The Court gives no weight to Randolph's argument that Carbon waived its termination rights by keeping the offer open until October 14, 2003, two days past the contract date.  Even if Carbon made such an oral agreement, that agreement affected only the date at which the agreement automatically terminated, not Carbon's right to terminate.  Equitable estoppel cannot apply here.

### c.   Must Randolph Prove that It Was Ready and Able to Close?

Carbon argues that Plaintiffs cannot prevail on their breach of contract claim at summary judgment because Plaintiffs cannot show as a matter of law that, notwithstanding Carbon's breach on October 9, 2003, Plaintiffs could have closed on October 14, 2003.  Carbon argues that even where a party repudiates a contract, the non-breaching party must still prove that it would have been ready, willing, and able to perform its own contractual obligations.  Randolph challenges Carbon's interpretation of the law.

A plaintiff claiming anticipatory breach of contract must show: "(1) that the defendant insisted upon terms not contained in the contract; and (2) that the plaintiff was 'ready, willing, and able to perform its own obligations under the contract when performance was due.'" United States v. Hon Yee-Chau, 17 F.3d 21, 26 (2d Cir. 1994) (quoting Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 523 (2d Cir. 1990)).[12]  Plaintiff seizes upon language in a New York Court of Appeals decision, American List Corp. v. U.S. News & World Report, Inc., 549 N.E.2d 1161 (N.Y. 1989), where the court held that where one party conducts an anticipatory breach of a bilateral contract, "[t]he nonrepudiating party need not . . . tender performance nor prove its ability to perform the contract in the future." Id. at 1165.  In that case, the New York Court of Appeals found that the non-breaching party did not have to prove its ability to perform in the future where the breaching party repudiated a 10-year contract less than two years into the agreement. Id.

The holding of American List does not apply to this situation and has not been consistently followed by New York courts in analogous cases, see, e.g., Inter-Power, Inc. v.

---

[12]     See also Record Club of Am., Inc. v. United Artists Records, Inc., 890 F.2d 1264, 1275 (2d Cir. 1989) ("[T]hough a party need not continue to perform the contract after the other party has anticipatorily repudiated it, he must nonetheless demonstrate that he had the willingness and ability to perform before the repudiation and that the plaintiff would have rendered the agreed performance if the defendant had not repudiated.").

Niagara Mohawk Power Corp., 686 N.Y.S.2d 911, 914 (App. Div. 3rd Dep't 1999), cert. denied, 717 N.E.2d 699 (1999) (finding summary judgment appropriate for defendant in part because plaintiff "was not ready, willing and able to perform the underlying contract at the relevant point in time"), or by courts in this district. See, e.g., Argonaut P'shp., L.P. v. Grupo Sidek, S.A. de C.V., 96 Civ. 1967 (MBM), 1996 WL 617335, at *5 (S.D.N.Y. Oct. 25, 1996) ("To prevail in a breach of contract action, the nonrepudiating party must demonstrate only that it was ready, willing and able to perform its obligations under the contract in the absence of the other party's breach.").  To prevail on its breach of contract claim, Randolph must establish that it was ready, willing, and able to satisfy Carbon's preconditions to closing.  The parties disagree about Randolph's ability to close.  This raises an issue of material fact that must be decided at trial.

## III. Recovery for Lost Profits

Since summary judgment is denied on Plaintiffs' breach of contract claim, there is no need to discuss Randolph's claimed damages, see supra page 8, but it is appropriate to discuss Plaintiffs' claim that they are entitled to prove the amount of their lost profits.  This argument is based on the premise that the parties anticipated liability for lost profits in their agreement.  Lost profits are recoverable under New York law when they are:

> [F]irst . . . demonstrated with certainty that such damages have been caused by the breach.  Second, the damages must be capable of proof with reasonable certainty.  In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.  Finally, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.

Care Travel Co. v. Pan Am. World Airways, Inc., 944 F.2d 983, 994 (2d Cir. 1991) (internal citations and quotations omitted).

Carbon argues that Plaintiffs are not entitled to lost profits because they fail in all three of the above elements: (1) there is no evidence that Carbon's termination caused the alleged lost profits; (2) there is no evidence that Carbon ever contemplated responsibility for lost profits; and (3) Plaintiffs have not established lost profits with reasonable certainty.  All three are sound but Carbon's argument under the second element is most compelling.

Nothing in the Commitment Letter or Letter of Intent refers to responsibility for lost profits; and Randolph's potential profits from the transaction were only tenuously related to the mezzanine loan.  The profits in this transaction, if any, would have wholly come from the conversion and sale of condo units.[13]  Where a contract is silent on liability for lost profits, "the court must take a 'common sense' approach, and determine what the parties intended by considering 'the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously.'" Smith v. Positive Prods., 419 F. Supp. 2d 437, 448-49 (S.D.N.Y. 2005) (quoting Kenford Co. v. County of Erie, 537 N.E.2d 176, 179 (N.Y. 1989)); see also Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 334 (2d Cir. 1993) ("In the absence of a contractual provision governing the availability of lost profits damages as a remedy for breach, New York law requires [courts] to consider what the parties would have concluded had they considered the subject.") (citation and internal quotation omitted).  The party claiming the damages has the burden of proof. See Trademark Research, 995 F.2d at 334.  However, "[t]he party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made." Positive Prods., 419 F. Supp. 2d at 448.

---

[13]    The Court is not swayed by Randolph's argument that the parties contemplated lost profits because of a line in the Letter of Intent stating that the loan was for the purpose of, among other things, "funding project costs." (See Pl. Ex. 88A at 1, under "Financing".)

Where lost profits have been allowed, it is because the breaching party had "near exclusive control" over the profitability of the business because of the nature of the agreement. See Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1578 (2d Cir. 1994). Nothing suggests that Carbon had such control over the profitability of the condominium conversion through its mezzanine loan. See Schonfeld v. Hilliard, 218 F.3d 164, 175 (2d Cir. 2000) (dismissing claims for lost profits damages in part because defendants did not exercise "'near exclusive control' over the profitability of the venture"). While it might be said that Carbon may have "controlled" whether Randolph was able to initially purchase the property, that does not mean that it controlled the eventual profitability of the project. Considering the nature, circumstances, and purpose of Carbon's agreement to provide mezzanine financing, there is no indication that the parties contemplated liability for lost profits. Accordingly, Randolph may not recover damages for lost profits and may not present evidence of such losses at trial.

## IV. The Fraud Claim

Carbon moves for summary judgment on Randolph's fraud claim, which arises out of representations by Carbon executives about Carbon's relationship with AFC and AFC's readiness to complete the mezzanine loan. There are factual questions on these issues which preclude summary judgment.

Plaintiffs state that Carbon told Randolph that AFC would function as "BlackRock/Carbon's co-lender/investor in mezzanine financing, and 'asset manager' with respect to the Project." (SAC ¶ 3.) Carbon allegedly told Randolph that: (1) Carbon and AFC regularly worked together on transactions; (2) Carbon and AFC already had a deal in place to assist Plaintiffs with the acquisition; (3) AFC had substantial and invaluable experience on this type of project; and (4) Plaintiffs would not be responsible for any additional expenses beyond

those specified in an August 4, 2003 Letter of Intent. (Id. ¶ 113.)  Randolph alleges that these

fraudulent representations about AFC enticed Randolph to work exclusively with Carbon to

finance the transaction. (Id. ¶¶ 118, 119.)[14]

Under New York law, to prove fraud a party must show: "(1) a material

misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent

to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the

plaintiff." Baker v. Dorfman, 239 F.3d 415, 423 (2d Cir. 2000).  Carbon argues that summary

judgment is appropriate because, even assuming that Carbon made such misrepresentations, the

alleged misrepresentations were immaterial to Plaintiffs and Plaintiffs did not suffer any injury

as a result of them.

Carbon argues that since Sharif never put any significance on the relationship between

AFC and Carbon, he cannot now claim that Carbon's representations about AFC's value to the

deal were material.  Carbon points to Sharif's deposition, where, in response to the question,

"Did you care whether or not AFC acted as asset manager," Sharif replied, "From day one . . . as

long as it was invisible to me, I didn't care." (See Schwartz Decl. Ex. 2 at 137:21-138:02.)

Carbon argues that since Sharif did not care whether AFC was involved in the financing,

misstatements about AFC's value to the project could not have been material.  Carbon's

argument fails on this point.  Sharif's deposition clearly shows that AFC's involvement was

immaterial to him only to the extent of whether it was AFC or another asset manager involved in

the transaction.  Sharif's key concern was that he worked with a group that could secure a deal,

be it AFC or some other group.  The materiality of Carbon's alleged misstatements is not that

AFC was involved, but that AFC was a valuable addition to the group due to Carbon's prior

---

[14]     To the extent that Plaintiffs include fraud claims relating to Carbon's alleged waiver of pre-closing
conditions other than those in the 9/10 Carbon Letter, the Court has already dismissed those claims. See Randolph
Equities, 2007 WL 914234, at *7.

experience with AFC and AFC's substantial experience on this type of deal.  Sharif states that

because of these representations, he agreed to work exclusively with Carbon to finance the

transaction. (See Affidavit of F. Adam Sharif ("Sharif Aff.") ¶¶ 33-35.)  On the record before it,

the Court cannot find as a matter of law that Carbon's representations about AFC's skill and

experience were immaterial to Randolph's decision to work with Carbon.

Carbon also argues that Randolph did not suffer any injury from the alleged

misrepresentations.  Randolph argues that its loss resulted from Carbon's decision to terminate

the deal, and that Carbon terminated because of conflicts between it and AFC.  Plaintiffs point to

e-mails and faxes that they describe as showing that, contrary to what Carbon had earlier

represented, Carbon and AFC did not yet have a deal in place. (See Pl. Exs. 117, 140, 153.)

Further, Glickman speculated at his deposition that Carbon may have terminated in part because

AFC and Blackrock/Carbon had not completed their deal. (See Pl. Dep. Vol. Ex. A at 92:23-

93:08 ("I think it was a combination of issues . . . The second issue was we may not have been

finished with our, you know, agreement, and that may have been giving them a bit of a

heartburn.").)   This raises an issue of fact which cannot be resolved on a motion for summary

judgment.  If in fact Carbon terminated because of disagreements with AFC, then the

misstatements about the strength of the deal between Carbon and AFC might have caused

Randolph losses if Randolph relied on that representation to work exclusively with Carbon.

**V.  Tortious Interference with Prospective Business Advantage**

Plaintiffs claim that Defendants tortiously interfered with Plaintiffs' business relationship

with Treasures Holdco by unjustifiably refusing to finance Randolph's property acquisition.

(SAC ¶ 134.)  To prevail on a claim for tortious interference with prospective business

advantage, the plaintiff must show that: "(1) it had a business relationship with a third party; (2)

the defendant knew of that relationship and intentionally interfered with it; (3) the defendant

acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's

interference caused injury to the relationship." Kirch v. Liberty Media Corp., 449 F.3d 388, 400

(2d Cir. 2006) (quotation and citation omitted).  Under New York law, the second element

requires the plaintiff to demonstrate "direct interference with a third party, that is, 'the defendant

must direct some activities towards the third party and convince the third party not to enter into a

business relationship with the plaintiff.'" Black Radio Network, Inc. v. NYNEX Corp., 2000 WL

64874, at *4 (S.D.N.Y. Jan. 25, 2000) (quoting Fonar Corp. v. Magnetic Resonance Plus, Inc.,

957 F. Supp. 477, 482 (S.D.N.Y. 1997)).

Plaintiffs' claim fails for the simple reason that it cannot show that Defendants interfered

directly with Treasures Holdco and that Defendants convinced Treasures Holdco not to complete

a deal with Randolph.  The entire thrust of Plaintiffs' complaint is that Carbon assured Randolph

that it would not terminate its financing as long as a few specific conditions were met, and then it

wrongly terminated the agreement.  There is no evidence of significant contact between Carbon

and Treasures Holdco, and particularly no contact that suggests that Carbon convinced Treasures

Holdco to scuttle an agreement with Randolph.  Defendants' motion for summary judgment on

this claim is granted.

**VI. Promissory Estoppel**

Plaintiffs' promissory estoppel claim is based on Carbon's alleged promises to finance

the purchase, subject to only a few conditions, as set forth in the 9/10 Carbon Letter.  To prevail

on a claim of promissory estoppel, a party must show: "1) a clear and unambiguous promise; 2)

reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result

of the reliance." Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).  "Promissory estoppel is a

legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract." Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 993 (S.D.N.Y. 1989).  A plaintiff may not recover under both a contractual theory and under quasi-contract, and "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract . . . for events arising out of the same subject matter." MacDraw, Inc. v. CIT Group Equip. Fin., 157 F.3d 956, 964 (2d Cir. 1997) (quotation and citation omitted).

The parties do not dispute that a valid written agreement existed; the issue under the claim for breach of contract is whether Carbon waived its contractual right to terminate for any reason.  The Court has decided that Randolph may prove waiver at trial by virtue of the 9/10 Carbon Letter or via Glickman's testimony at the September 12, 2003 hearing, but not through any oral modifications, due to the no-oral-modification clause.  To prove promissory estoppel, a plaintiff must establish reasonable reliance on the defendant's statements.  But where the "terms of an unambiguous contract are inconsistent with the statements that form the basis of the claim, the claiming party could not have reasonably relied on those statements as a matter of law." Ixe Banco, S.A. v. MBNA Am. Bank, N.A., 07 Civ. 0432 (LAP), 2008 WL 650403, at *11 (S.D.N.Y. Mar. 7, 2008) (emphasis in original).  Randolph cannot have reasonably relied on the alleged oral promises that comprise its promissory estoppel claim, because the agreement between the parties contained an unambiguous no-oral-modification clause. See id. at *12 (finding that plaintiff's reliance on defendants' oral assurances that it was willing to change a closing date "was unreasonable as a matter of law" because the "oral representations [we]re inconsistent with the provision in the contract forbidding oral modifications").  Plaintiffs' lack of reasonable reliance is fatal to its promissory estoppel claim.

## VII.   Equitable Estoppel

Plaintiffs' equitable estoppel claim is based on the same alleged misrepresentations underlying its remaining fraud claim; that Defendants misrepresented their relationship with AFC and their readiness to close the deal with AFC, and that Randolph reasonably relied on these promises in working exclusively with Carbon.  The equitable estoppel claims cannot relate to Carbon's alleged promise to waive preconditions to the financing agreement, because those claims are part of the breach of contract claim only.  See Spencer Trask Software & Info. Servs. LLC v. Rpost Int'l, Ltd., 383 F. Supp. 2d 428, 461 (S.D.N.Y. 2003) ("[W]here the sole basis for the plaintiffs' fraud-based claim is the defendants' intent not to perform the contract, the proper relief is under a claim for breach of contract, not equitable estoppel.").

Equitable estoppel "is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 725 (2d Cir. 2001).  A plaintiff asserting equitable estoppel must show, on the part of the party being estopped: "(1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts." In re Vebeliunas, 332 F.3d 85, 93-94 (2d Cir. 2003).  The plaintiff must also show, on its part: "(1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in [its] position[]." Id. at 94.  New York courts have "consistently held that the doctrine of equitable estoppel cannot be invoked to create a right where one does not otherwise exist." Wilson v. Hevesi, 96 Civ. 1185 (SAS), 1998 WL 351861, at *6 (S.D.N.Y. June 29, 1998); see also McLaughlin v. Berle, 418 N.Y.S.2d 246, 248 (App. Div. 3rd Dept. 1979) ("[T]he doctrine should only be applied when

failure to do so would operate to defeat a right legally and rightfully obtained.  It cannot operate to create a right.")

The allegations here cannot sustain an equitable estoppel claim.  Randolph's claim relates to Defendants' misrepresentations about their relationship and completed agreement with AFC. An estoppel claim is meant to prevent one party from enforcing a right that would work an injustice upon another party, but there is nothing to be estopped here because there is no right asserted.  Plaintiffs clearly want their estoppel claim to relate to Carbon's termination of the contract, but that would only apply if the underlying false representations related to the alleged waiver of preconditions in the financing agreement.  The underlying false representations here relate to Defendants' relationship with AFC; even if the Court or a fact finder found that Randolph justifiably relied on the misstatements, there would be no "right" to estop. See <u>Aniero Concrete</u>, 1998 WL 148324, at *11 ("Estoppel is defined as 'a bar which precludes a person from questioning a fact which he has by his conduct induced another person to believe and to act on to his prejudice.'") (quoting 57 N.Y. Jur. 2d § 2).[15]  Accordingly, Defendants' motion for summary judgment on the equitable estoppel claim is granted.

## CONCLUSION

To summarize the Court's holdings, Defendants' motion for summary judgment is DENIED on the breach of contract and fraud claims; and GRANTED on the tortious interference with prospective business advantage, promissory estoppel, and equitable estoppel claims. Plaintiffs' cross-motion for summary judgment on its breach of contract claim and certain damages claims is DENIED.  The no-oral-modification clause within the September 10, 2003

---

[15]     <u>See also</u> <u>Holm v. C.M.P. Sheet Metal, Inc.</u>, 455 N.Y.S.2d 429, 433 (App. Div. 4th Dept. 1982) ("Parties are estopped to deny the reality of the state of things which they have made to appear to exist and upon which others have been made to rely.  It does not operate to create rights otherwise nonexistent; it operates merely to preclude the denial of a right claimed otherwise to have arisen.").

Commitment Letter governs, and Plaintiffs may not use purported oral modifications to establish waiver at trial. Plaintiffs must also demonstrate at trial that they were ready, willing, and able to close the transaction on October 14, 2003. Further, the parties did not contemplate liability for lost profits, and Plaintiffs may not present evidence at trial to establish such damages. The Clerk of the Court is directed to close out the motions on the docket numbered 59 and 69. The Court will contact the parties to arrange a date in September for a pretrial scheduling conference.

Dated: New York, New York
       August 24, 2009

SO ORDERED

PAUL A. CROTTY
United States District Judge